**Linda K. HAMILTON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 109–73–A.**

United States District Court, E. D. Virginia, Alexandria Division.

Jan. 16, 1974.

11. In re Sherman Plastering Corp., 346 F.2d 492, 496 n. 3 (2d Cir. 1965).

A. Andrew Giangreco, Giangreco, Seay & Manuel, Alexandria, Va., for plaintiff.

J. Frederick Sinclair, Asst. U. S. Atty., Alexandria, Va., and George M. Fleming, Trial Atty., Civil Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

JUERGENS,* Senior District Judge.

## MEMORANDUM AND JUDGMENT

Jurisdiction is based on the Federal Tort Claims Act, 28 U.S.C. Sections 1346(b) and 2671 et seq., whereby plaintiff seeks recovery for damages allegedly resulting from the negligence of the defendant United States. The incident occurred at the second overlook at the George Washington Memorial Parkway in Arlington, Virginia. Under the provisions of the Federal Tort Claims Act, the plaintiff may recover under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. Thus, whether the United States is liable to the plaintiff in this case must be determined in the same manner and to the same extent as a private individual under the same circumstances would be liable under the law of the State of Virginia, since the cause of action out of which this case arises occurred in the State of Virginia.

The evidence established that the plaintiff, Linda K. Hamilton, does not remember any of the events which occurred on July 25, 1970, the date upon which the incident out of which this cause arises occurred. Nor does she remember any of the events leading up to the accident or any of the events that

* Senior District Judge William G. Juergens of the Eastern District of Illinois sitting by designation.

occurred subsequent to the accident. The parties agreed that the only actual witness to the events leading up to and the occurrence itself was Terrance Neil Hamilton, plaintiff's husband.

On the morning of July 25, 1970, plaintiff and her husband went for a sight-seeing drive and in the course of their drive from Alexandria, N.W., traveled along the George Washington Memorial Parkway to the second overlook past the Key Bridge. The stated purpose of the trip, as supported by the evidence, was to go sight-seeing. It was established that on or about 10:45 a. m. on the day of the accident, at the second overlook on the George Washington Memorial Parkway, Arlington County, Virginia, plaintiff and her husband, together with their dog "Mandy," were sight-seeing, having arrived at the second overlook at approximately 10:15 a. m. The weather was a typical summer day for the area; it was hot and dry; there was no rain. The weather was clear; there were no clouds nor fog in the area. The temperature was in the low to mid 80's; visibility was unlimited.

The second overlook on the George Washington Memorial Parkway is on a United States Reservation owned by the National Capital Park Service, United States Department of the Interior, and is maintained by the George Washington Memorial Parkway. The overlook consists of a parking area which is approximately 200-feet in length with a 6-foot sidewalk abutting the parking area. On the outer edge of the sidewalk there is an 18-inch high stone retaining wall abutting the sidewalk on the Potomac River side.

On the day in question, plaintiff and her husband drove to the overlook, parking their car in the parking area. They got out of their car, taking their dog "Mandy," which was described as a rather small dog and still a puppy. The testimony was that the Hamiltons together with their dog, after parking their car and getting out, went over and sat on the retaining wall for a while, and noting a grassy area below the retaining wall, walked down over the grassy area and came to a path which led along a chain link fence overgrown with honeysuckle. The fence was approximately 5-feet high. In traveling along the pathway adjacent to the honeysuckle, they came to a point where there was an opening in the honeysuckle, where the chain link fence had apparently been cut; they then proceeded through the opening in the chain link fence. Mr. Hamilton stated there was ample room for them to walk through; that Mrs. Hamilton walked through first and he followed; that they proceeded down the pathway which had a decline from 50 to 60 degrees; that after traveling along the path a short distance, approximately 15 to 20 yards, the path came to an end and forked—one portion forked off at about a 90 degree angle to the right and was level. During their course down the path, their dog followed along. At the fork the Hamiltons turned to the right and proceeded 12 to 20 feet to where the path abruptly ended and Mr. Hamilton testified they stopped, since there was heavy overgrowth in front of them and no apparent path leading anywhere. They then decided to turn around and return. As they started to turn around, Mr. Hamilton went to pick up the dog, but it ran between his legs and into the heavy overgrowth. The evidence established that the only sounds from the dog immediately after it went out of sight into the underbrush was some crashing or thrashing around in the underbrush and shortly thereafter the dog began yapping. Upon cross-examination, Mr. Hamilton's testimony in his deposition was brought out. According to the deposition testimony (which Mr. Hamilton admitted), he stated when they reached the end of the path to the right, they decided to turn around, seeing that it was too steep; that he turned to pick up Mandy (the dog), and as she ran between his legs, she was peering over the edge, and as he turned to grab her, she fell through apparently some bushes and overgrowth below. The Hamiltons then returned to the area where the trail

forked. After a brief discussion, Mrs. Hamilton stated she would make the descent to retrieve the dog because of her agility and that she had good toes for gripping. She then sat down on the ground at the fork in the path, took off her shoes, sat down on her butt, and began to scoot down to the area where they believed the dog to be. They could still hear the dog yelping below them. She scooted down approximately 5 feet when she started to slide on the dirt and loose rock. As she slid through the underbrush, she disappeared. Mr. Hamilton then called to her and, receiving no response, became worried and proceeded down the same area his wife had gone to attempt to rescue her. He began to slide and saw a straight drop (which it was later learned was 75 to 100 feet sheer drop cliff). He managed to pull himself back up to the fork and ran back to the Parkway, where he summoned a motorist who obtained help. While waiting for the help to return, a second motorist stopped, and the motorist, a man, who was apparently familiar with the area, was able to lead Mr. Hamilton by a different route down to the area where Mrs. Hamilton had fallen.

Mr. Leroy Artis, maintenance supervisor for the National Capital Parks and, as such, agent of the defendant, stated he was familiar with the second overlook site and stated the grass along the Parkway was cut every 8 to 10 days and that he went to the overlook more often than that because he was on the Parkway each day; he stopped at the overlook every 2 or 3 days to check the area; he had a 3-man sanitation crew who collected the trash daily at the overlook site and checked the area to see what, if anything, needed to be done; and his men who were in charge of picking up the trash checked around to see if there was any repair needed and would have noticed if there was a break in the fence. He stated that he had not received a report of any break in the fence, nor had he himself ever observed one. The evidence did not establish that the defendant, or any of its agents, had prior knowledge of the fence having been cut or the opening having been made therein prior to the incident out of which this case arises. Plaintiff's husband testified he did not see any chain link fence, nor did he see any rocks on the far bank of the Potomac River.

Plaintiff and defendant's joint Exhibits 3, 4 and 5 show the existence of the chain fence, the break or cut therein, and further show the trees and rocks on the far side of the river. Examination of the photographs, introduced as plaintiff and defendant's joint Exhibits 1, 2, 3, 4 and 5, shows that by only slight observance anyone approaching the break in the chain fence and the area lying below could and should have seen that it was an area of danger in that the area lying below the chain fence is quite steep, heavily covered with underbrush, and discloses the tops of trees, the bases of which must necessarily be far below.

The test in this case under the Federal Tort Claims Act is whether or not a private individual would be liable to the plaintiff under the law of the State of Virginia under the evidence as has here been presented. Congress gave the district courts jurisdiction of civil actions on claims against the United States, for money damages, for personal injury caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

The 1973 Cumulative Supplement of the Code of Virginia 1950 provides:

§ 8–654.2. Duty of care and liability for damages to hunters, fishermen, sightseers, etc.—(a) For the purpose of this section 'landowner' means the legal title holder, lessee, occupant or any other person in control of land or premises.

'Land' or 'premises' means real property, waters, boats, private ways, natural growth, trees and any building or structure which might be located on such real property, waters, boats, private ways and natural growth.

(b) A landowner shall owe no duty of care to keep land or premises safe for entry or use by others for hunting, fishing, trapping, camping, water sports, hiking, sightseeing, nor shall a landowner be required to give any warning of hazardous conditions or uses of, structures on, or activities on such land or premises to any person entering on such land or premises for such purposes, except as provided in (d) hereof.

(c) Any landowner who gives permission to another person to hunt, swim, trap, camp, hike, or sightsee upon land or premises does not thereby:

(1) Impliedly or expressly represent that the premises are safe for such purposes; or

(2) Constitute the person to whom such permission has been granted an invitee to whom a duty of care is owed; or

(3) Assume responsibility for or incur liability for any intentional or negligent acts of such person or any other person, except as provided in (d) hereof.

(d) The provisions of this section shall not limit the liability which otherwise exists:

For wilful or malicious failure to guard or warn against a dangerous condition, use, structure or activity; or

For injuries suffered in any case where permission to hunt, fish, trap, camp, hike, or sightsee, or for any other legal purpose, was granted for a consideration other than the consideration, if any, paid to such landowner by the State, the federal government or any other governmental agency.

The statute sets up certain prerequisites before it becomes applicable—(1) The person must come upon the land to hunt, swim, trap, camp, hike, or sightsee; (2) No consideration must have been paid by the user to the landowner.

According to the evidence, plaintiff came upon the premises for the purpose of sight-seeing—thus bringing the cause within the provisions of point (1).

■ Plaintiff argues that since she is a taxpayer, she has therefore paid consideration for the use of the land. In support of this proposition, she cites Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In Flast it was stated that a litigant as a taxpayer had standing to challenge the constitutionality of a statute in federal court. Only by the most vivid stretch of the imagination could Flast be construed as establishing the proposition that a taxpayer who pays taxes is therefore paying a consideration for the use of land owned by the United States. The entire testimony in this case established that there was no charge made for the use of the Parkway or the overlook or for that matter any part of the area involved in this litigation.

■ Thus, under Virginia law, the landowner, United States of America, owed no duty of care to keep the land or premises safe for entry or use by others for sight-seeing, nor under the law of the State of Virginia was the landowner required to give any warning of hazardous conditions or uses of, structures on, or activities on such land or premises to any person entering the land. Furthermore, under Virginia law the statute provides that any landowner who gives permission to another to sightsee upon the land or premises does not impliedly or expressly represent that the premises are safe for such purpose or constitute the person to whom such permission has been granted an invitee to whom a duty of care is owed, or assume responsibility for or incur liability for any intentional or negligent acts of such person or any other person except as provided in paragraph (d).

The provisions of paragraph (d) provide that the section shall not limit the liability which otherwise exists for wilful or malicious failure to guard or warn against a dangerous condition, use, structure or activity; or for injuries suffered where consideration is paid.

The Court finds that there was no consideration paid by plaintiff for the use of the land in question, and it further finds that the evidence totally failed to show that the defendant, United States of American, was wilful or malicious in failure to guard or warn against a dangerous condition, use, structure or activity.

To the contrary, the Court finds that the defendant under the evidence as presented did establish safeguards to protect persons on the property—one of which was the erection of the chain link fence which was to reasonably prohibit passage by pedestrians beyond a certain point in the overlook; that there was a break or that the chain link fence had been cut was not by the evidence shown to have been within the knowledge of the defendant, United States of America, prior to the incident in question. It was not established that the defendant knew or should have known of the existence of the break or cut in the chain link fence.

As was stated in Glasscock v. United States, 207 F.Supp. 318 (D.C.E.D.Va., Alexandria Div. 1962):

The owner must give notice or warning to an invitee of an unsafe condition, which is known to him and is unknown to the invitee; but notice or warning is not required where the dangerous condition is open and obvious to a person who is exercising reasonable care for his own safety. In the absence of knowledge or warning of danger, such an invitee is entitled to assume that the premises are reasonably safe for his visit. The duty to warn, however, exists only with respect to latent dangers, not to those which are or ought to be obvious to the invitee. To sustain a charge of neg-

ligence, the unsafe condition relied on must be one of which the owner knew or should have known, and the invitee did not know and could not reasonably have discovered. . . . (cases cited).

In the case at issue only slight observation by the plaintiff would have disclosed the existence of a chain link fence and should have raised some question of safety to a reasonably prudent person. Further, the existence of an incline of approximately 50 to 60 percent below the chain fence should have raised grave question in the plaintiff's mind with regard to safe travel on the path. The fact that plaintiff's dog had suddenly disappeared after standing on the edge of a precipice should likewise have raised a question of safety for the plaintiff. That she failed to act in a reasonable manner for her own safety is further exemplified by her return to the fork in the pathway and there sitting down and removing her shoes and then sliding down the steep incline on loose rocks and dirt without ascertaining first what was beyond the underbrush slightly below her.

When tested by all of the evidence presented, it does not establish that the government was guilty of negligence which was the proximate cause of plaintiff's injuries. As was stated in Glasscock, supra:

". . . To sustain a charge of negligence, the unsafe condition relied on must be one of which the owner knew or should have known and the invitee did not know and could not reasonably have discovered."

The Court finds that, under the factual situation here presented, the defendant is not guilty of negligence as charged in plaintiff's complaint.

Plaintiff has moved to amend the complaint to conform to the evidence, which the Court has considered and finds that no useful purpose would be served by granting the motion to amend, since the matters alleged therein were not substantiated by the evidence. The Motion

to Amend will be and the same is hereby denied.

The Court finds that judgment should be entered for the defendant, United States of America, and against the plaintiff, Linda K. Hamilton, plaintiff, and that plaintiff take nothing by her suit.

The above and foregoing shall be considered findings of fact and conclusions of law.

It is, therefore, the order of this Court that judgment be and the same is hereby entered in favor of the defendant, United States of America, and against the plaintiff, Linda K. Hamilton. Plaintiff to take nothing by her suit. Costs assessed against plaintiff and execution to issue therefor.