## CIRCUIT COURT OF FAIRFAX COUNTY

Robert David Hiett

v.

Barcroft Beach, Inc., et al.

December 7, 1989

Case No. (Law) 85646

By JUDGE THOMAS J. MIDDLETON

Four of the five named defendants in this suit seek summary judgment. Oral argument was heard on October 27, 1989. For the reasons stated below, summary judgment is granted as to defendants Lake Barcroft Community Association (hereafter "LABARCA"), Barcroft Beach, Inc. (hereafter "BBI") and Barcroft Lake Management Association, Inc. (hereafter "BARLAMA") [but] denied as to defendant Penland.

BBI is a Virginia corporation which owns an artificial lake known as Lake Barcroft, located in the Lake Barcroft Subdivision, Fairfax County, Virginia. *See* BBI's Answer and Grounds of Defense to Second Amended Motion for Judgment (hereafter "BBI's Answer") at para. 6. BARLAMA is a Virginia corporation which operates, supervises, and controls Lake Barcroft. *See* BARLAMA's Answer and Grounds of Defense to Second Amended Motion for Judgment (hereafter "BAR-LAMA's Answer") at para. 6. In May, 1987, LABARCA sponsored a race known as the "Lake Barcroft Teflon Man Triathlon" (hereafter "Triathlon" or "race"). *See* LABARCA's Answer and Grounds of Defense to Second Amended Motion for Judgment (hereafter "LABARCA's Answer") at para. 2. According to the rules for the race, teams of up to three participants

were invited to join, with each participant performing one or more of the Triathlon's three segments (swimming, running, and bicycling). Upon completing an Entry Form and paying a fee of $11.00, applicants would be entitled to participate in the race, at the conclusion of which he or she would receive a sun visor or T-shirt.

Defendant Novins invited Plaintiff Robert David Hiett to participate in the Triathlon, and he agreed to perform the swimming segment for Novins's team. Sometime prior to the race, Novins gave Hiett an Entry Form. Hiett filled in his name, address, birth date, age, gender, work, and home phone numbers and signed the form. Novins then paid Hiett's $11.00 entry fee.

On May 23, 1987, the Triathlon was held as scheduled. The first segment of the race was the swimming portion, to be conducted in Lake Barcroft. Pursuant to the race rules, all the swimmers (including Hiett) lined up along one edge of Beach 4. When a starter pistol was fired, Hiett ran into the water along with the other swimmers. As he reached thigh-deep water, Hiett pushed off the bottom of the lake to begin swimming. At that moment, he was apparently involved in some collision which caused his neck to break, rendering him a quadriplegic.

This lawsuit ensued, with a Motion for Judgment initially filed on July 7, 1988. Following some discovery, the Plaintiff filed an Amended Motion for Judgment on February 7, 1989, which alleged additional facts and additional counts of negligence. A Second Amended Motion for Judgment was then filed on May 3, 1989, alleging the same facts and counts but adding the two individual defendants, Thomas Penland and Evelyn Novins. In broad terms, Plaintiff claims that the Defendants collectively failed (1) to ensure that the Lake was reasonably safe, (2) to properly supervise the start of the swimming segment, (3) to advise the participants of the risk of injury, and (4) to train them how to avoid such injuries.

BBI, BARLAMA, LABARCA, and Thomas Penland generally deny any negligence. In addition, all four have

moved for summary judgment.[1] They claim that the waiver contained in the entry form signed by Plaintiff releases them from all claims for damages as set forth in Plaintiff's Second Amended Motion for Judgment. In the alternative, they argue that Virginia's recreational use statute shields them from this tort liability.[2]

The Entry Form which Hiett signed contained the following language:

> In consideration of this entry being accept [sic] to participate in the Lake Barcroft Teflon Man Triathlon I hereby, for myself, my heirs, and executors waive release and forever discharge any and all rights and claims for damages which I may have or my [sic] hereafter accrue to me against the organizers and sponsors and their representatives, successors, and assigns, for any and all injuries suffered by me in said event . . . .

This language is clearly an attempt to contractually insulate and exculpate the organizers, sponsors, and their representatives from tort liability arising from injuries sustained during the race. As was stated in *Barnes v. New Hampshire Karting Ass'n., Inc.,* 509 A.2d 151, 153 (N.H. 1986):

> Exculpatory agreements call into conflict two tenets of the law. First, a party should be liable for the consequences of the negligent breach of a duty owed to another . . . . Contraposed against this basic rule of tort law is

---

[1] Defendant Evelyn Novins filed a Demurrer on June 1, 1989, claiming that the second amended motion for judgment fails to state a cause of action against her. Because this motion has not yet been set for argument, it is not presently ripe for disposition.

[2] Defendants' remaining theories in support of summary judgment are (1) assumption of risk, (2) lack of causation, and (3) standard of care owed to a mere licensee. These theories all involve disputed issues of fact; therefore, they will not be addressed at this juncture.

the principle that, as a matter of efficiency and freedom of choice, parties should be able to contract freely about their affairs. ABA Special Committee on the Tort Liability System, Towards a Jurisprudence of Injury: The Continuing Creation of a System of Substantive Justice in American Tort Law § 5-27 (Nov. 1984); *Morrow v. Auto Championship Racing Ass'n.*, 8 Ill. App. 3d 682, 685, 291 N.E.2d 30, 32 (1972). Under this rule, parties may bargain for various levels of risk and benefits as they see fit. Thus, a plaintiff may agree in advance that the defendant has no legal duty towards him and thereby assume the risk of injury arising from the defendant's conduct. *See* W. Keeton, D. Dobbs, R. Keeton, D. Owen, Prosser and Keeton on the Law of Torts § 68, at 480-481 (5th ed. 1984).

Faced with these conflicting tenets, courts have consistently held that a defendant seeking to avoid liability under an exculpatory agreement must show (1) that the agreement does not contravene public policy, (2) that it could be readily understood by a reasonable person in the plaintiff's position, and (3) that it clearly and unequivocally releases the defendant from precisely the type of liability alleged by the plaintiff. Each of these issues will be addressed in turn.

Turning first to the public policy dimension, certain parties have been prohibited as a matter of public policy from contractually limiting their tort liability. Thus such a provision has been held void when contained in the contract of carriage of a common carrier, unless a reduced fare was charged; or in the contract of a public utility under a duty to furnish telephone service; or when imposed by an employer as a condition of employment. For citations, *see* Restatement (Second) of Torts § 469B, comment g (1965); *and* Restatement of Contracts § 575 (1932).

In this case, the Defendants do not fall into any of the previously recognized categories of parties prohibited from limiting their tort liability. The Court therefore holds that none of these defendants are barred as a matter of public policy from attempting to limit their liability.

Plaintiff raises a threshold issue which must be resolved before reaching the substance of the release. It is a matter of black letter law that both contracting parties must assent to the same terms before they will be bound. In this case, Plaintiff contends that he could not have assented to this waiver because he never read it. Since he had no prior experience in such athletic competitions, he argues, it would be unreasonable for him to have realized that he was being asked to release future damage claims when presented with an "Entry Form." This issue is alleged to pose an issue of fact sufficient to withstand the instant summary judgment.

This argument must fail, however, because Plaintiff admits that he signed the Entry Form. Plaintiff's Response to Request for Admissions of Defendants BBI and BARLAMA, para. II(2). When a person signs a document, he is generally not permitted to show that he did not know its terms, and in the absence of fraud or mistake, he will be bound by all its provisions, even though he has not read the agreement and does not know its contents. Except as to illiterates, the signing of a document which plainly purports to be a contract gives rise to an implication of assent to its terms despite ignorance of the contents thereof. Thus, signing a written document raises a presumption that the writing reflects mutually acceptable terms. This shifts the burden to the Plaintiff to prove why he should not be bound. *Nationwide Mutual v. Muncy*, 217 Va. 916, 919 (1977); *In re Simmons*, 27 B.R. 508, 510 (W.D. Va. 1983); *Matter of Abingdon Realty Corp.*, 18 B.R. 571 (E.D. Va. 1982); *see also* 17 C.J.S. *Contracts* §§ 41(f), 136-137, 143 *and Corbin on Contracts* § 607 (discussing rule that one who signs a written instrument is presumed to have read it and will be bound by its terms).

As this case unfortunately illustrates, the result of applying this principle to exculpatory releases is particularly harsh since the injuries are often catastrophic. Nevertheless, this presumption has been consistently applied in such cases, as a necessary principal of contract law. *See, e.g, Barnes, supra*, 509 A.2d at 154, *and Lee v. Allied Sports Associates, Inc.*, 209 N.E.2d 329, 332-33 (Mass. 1965), and cases cited therein; *but see Ferrell v. S. Nev. Off-Road Enthusiasts*, 195 Cal. Rptr. 90 (Cal. App. 2 Dist. 1983) (holding that intent to release poses

issue of fact precluding summary judgment, notwithstanding clearly expressed waiver in exculpatory agreement).

In this case, the issue of contractual assent will only reach the jury if Plaintiff can rebut the presumption of assent at this juncture. To do this, he must point to some disputed material facts concerning illiteracy, fraud, duress, misrepresentation, denial of opportunity or the like. He has failed to do so.

Plaintiff does not argue that he was unable to read and understand the release; nor does he claim that he was denied the opportunity to read it before signing. He does not claim that any Defendant committed a fraud or misrepresentation. At worst, he suggests that his failure to read the release amounts to a unilateral mistake of fact. But a unilateral mistake affords no ground for avoiding a contract unless it causes a complete difference in subject matter or where it is caused by or known to the other party. *In re Jay's Trucking Co., Inc.*, 26 B.R. 73, 76 (E.D. Va. 1982). As stated in *Lee, supra*, 209 A.2d at 332, "[H]aving failed to avail himself of [the opportunity to read the body of the release], yet gaining the admission to which his signature was a condition precedent, he cannot now complain that he had no notice of the import of the paper . . . he signed." The inquiry thus proceeds to the substance of the release.

Courts generally require the language employed in exculpatory provisions to specifically and clearly release the defendant from liability for personal injuries. *See Barnes, supra*, 509 A.2d at 154, *citing Arnold v. Shawano County Agr. Soc.*, 106 Wis. 2d 464, 470, 317 N.W.2d 161, 164 (1982), *aff'd.*, 111 Wis. 2d 203, 330 N.W.2d 773 (1983). Of course, the parties need not have contemplated the precise occurrence that resulted in the plaintiff's injuries. They may adopt language to cover a broad range of accidents, as they did in this case. *See Barnes, supra*, 509 A.2d at 154.

The Plaintiff herein challenges the instant release on this very point. He claims that this attempted release must fail because it does not expressly purport to release the Defendants from liability arising from their negligence, in part because it does not use the terms "liability" or "negligence." In addition, he claims that this release is simply not clear and unambiguous enough to convey its

legal significance to an individual untrained in the law. He then cites numerous cases in which courts from various jurisdictions have limited the effect of comparable exculpatory agreements. *Gill v. Rollins*, 722 F.2d 55 (4th Cir. 1983) (alarm service); *Diedrich v. Wright*, 550 F. Supp. 805 (N.D. Ill. 1982) (parachuting); *Zimmer v. Mitchell and Ness*, 253 Pa. Super. 474, 385 A.2d 437 (1978) (ski equipment rental); *Rosen v. LTV Recreational Development, Inc.*, 569 F.2d 1117 (10th Cir. 1978) (skier).

The Court understands that the opinions cited by Plaintiff narrow and avoid the effect of exculpatory releases. However, these opinions will be rejected for two reasons. First, the Fourth Circuit very recently held that no "magic words" are needed in contracts such as this one. *Krazek v. Mountain River Tours, Inc.*, 884 F.2d 163 (4th Cir. 1989). This decision appears to be sound for the very reason raised by Plaintiff: the average lay person would not appreciate the full legal significance of a provision by which one party was "released from liability arising from his negligence." The use of legal jargon such as "liability" or "negligence" would only obfuscate the significance or exculpatory clauses. The better reasoned approach is that adopted by Defendants here, by which participants agree to "release . . . any and all rights and claims for damages which . . . may hereafter accrue to me . . . for any and all injuries suffered by me in said event . . . ." With the possible exception of the word "accrue," this clause clearly expresses an agreement to waive legal claims for injuries sustained in the race.

There is another reason for rejecting Plaintiff's "magic words" argument. The term "negligent" is, after all, only legal shorthand: to say that a defendant was "negligent" is to say that he is responsible to compensate the plaintiff for injuries which were proximately caused by the defendant's breach of a duty of care owed to the plaintiff. A judicial interpretation of exculpatory agreements which releases a defendant from everything except for "liability arising from his own negligence" actually releases him from nothing at all. Such an interpretation would mean that the plaintiff agreed to waive all claims except those for which the defendant is legally responsible. That is not a release.

Based on the foregoing, it is the opinion of the Court that the exculpatory language contained in the Entry Form is a valid, binding release. Consistent with the rigorous judicial scrutiny outlined above, the instant release will be strictly construed against the parties who seek its protections. In this vein, two additional issues remain: (1) which of the claims alleged in the Second Amended Motion for Judgment are within the scope of claims waived by the release, and (2) which Defendants are entitled to shield themselves under this release.

By signing the release, Plaintiff expressly waived "any and all rights and claims for damages which I may have or my [sic] hereafter accrue to me . . . *for any and all injuries suffered by me in said event . . . .*" (emphasis added). In *Ciofalo v. Vic Tanney Gyms, Inc.*, 177 N.E.2d 925, 926-27 (Ct. App. N.Y. 1961) and *Douglas v. Skiing Standards, Inc.*, 459 A.2d 97, 98-99 (Vt. 1983), it was held that ordinary negligence claims were within the scope of exculpatory releases worded as broadly as the instant release. Elsewhere, in *Smith v. Golden Triangle Raceway*, 708 S.W.2d 574 (Tex. App. 1986), a Texas court held that it would violate public policy for a defendant to shield himself from liability occasioned by gross negligence under a similarly-worded release. *Cf. Trainor v. Aztalan Cycle Club, Inc.*, 432 N.W.2d 626, 631 (Wis. App. 1988) (construing scope of negligence claims waived by similarly broad exculpatory language). Applying this line of demarcation, the Court holds that the only liability released by this provision is that arising from simple negligence.

The Plaintiff does not allege any gross negligence, wanton or reckless conduct, or intentional misconduct in the Second Amended Motion for Judgment. Accordingly, all of the negligence claims as alleged are encompassed by the release. It must be determined, however, against which defendants the Plaintiff agreed to waive these claims.

As the release itself states, the only parties against whom Plaintiff agreed to discharge future claims were "the organizers and sponsors and their representatives, successors, and assigns . . . ." It must be decided on the strength of the pleadings and admissions which Defendants fit into these categories. The parties offer little argument on this point; the Defendants generally claim

that the instant action is barred by the release, while the plaintiff generally challenges the validity and effect of the release but not its scope.

Turning first to para. 6 of the Second Amended Motion for Judgment, the Plaintiff alleges that BBI and BARLAMA "owned, operated, supervised, controlled and maintained" Lake Barcroft on the date of the accident. In its Answer, BBI admits only that it owned the Lake (at para. 6). BARLAMA admits at para. 6 of its Answer only that it operated, supervised and controlled the Lake. LABARCA and Penland do not respond to para. 6, claiming that it does not apply to them. Elsewhere, Plaintiff alleges that LABARCA "sponsored" the triathlon with the "concurrence and permission" of BBI and BARLAMA (para. 7). LABARCA admits this allegation (para. 2 of LABARCA's Answer) while BBI and BARLAMA respond that they lack sufficient knowledge to admit or deny this allegation and therefore deny the same. (Para. 7 of BBI's and BARLAMA's Answers, respectively).

Viewing these allegations and admissions together, Plaintiff alleged and LABARCA admitted that LABARCA sponsored the event. In light of this undisputed fact, the Court holds that LABARCA was a "sponsor" of the race as that term is used in the release: LABARCA is therefore within the scope of the release and its motion for summary judgment is accordingly granted on this basis.

As to BBI and BARLAMA, however, the facts are in dispute. There is no allegation that these two defendants either organized or sponsored the race, while they each deny both concurrence and permission. The Court therefore cannot award summary judgment to BBI or BARLAMA under the release.[3]

---

[3] This conclusion rests solely on the allegations set forth in the Second Amended Motion for Judgment and the admissions set forth in the defendants' Answers thereto. Beyond this, it is noted that BBI and BARLAMA conceded on at least two other occasions that LABARCA sponsored the race. At p. 3 of their Memorandum in Support of Summary Judgment, BBI and BARLAMA state that "the event was ORGANIZED AND SPONSORED BY LABARCA." (Emphasis added.) Again, at p. 15 of their Reply to Plaintiff's Opposition to Summary Judgment, they contend that LABARCA "CONCEIVED AND ORGANIZED" the race on property "gratuitously loaned" by BBI and BARLAMA. (Emphasis added.) Nowhere does either BBI or BARLAMA offer any facts or argument to support a conclusion that either of

324

Turning now to Defendant Penland, the Plaintiff alleges in para. 5 of his Second Amended Motion for Judgment that Penland was a resident of Lake Barcroft and acted as chairman of the informal race committee which "organized" the race. Penland did not respond to this allegation, claiming that it does not apply to him (Penland's Answer at para. 2). In para. 12 of the Second Amended Motion for Judgment, the Plaintiff alleges that Penland had major responsibility for "organizing and running" the race, including the decision to start the race from the beach rather than from in the water. Penland denies this allegation as phrased (Penland's Answer at para. 3). In sum, Plaintiff alleges that Penland "organized" the race and Penland denies it. Beyond this, Penland has failed to establish that he is a "representative" of an organizer or sponsor within the meaning of the release. This clearly poses a dispute as to a material fact prohibiting the Court from awarding Penland summary judgment under the release.

The only remaining theory to support an award of summary judgment as to the three remaining defendants may be found in Virginia's recreational use statute. As worded on the date of the accident in question, that statute provided, in pertinent part, that:

> (b) A landowner shall owe no duty of care to keep land or premises safe for entry or use by others for . . . participation in water sports . . . nor shall such landowner be required to give any warning of hazardous conditions . . . on such land or premises to any person entering on such land for such purposes, except as provided in (d) hereof . . . .
>
> (d) Nothing contained in this section shall limit the liability of a landowner which may otherwise arise or exist by reason of his gross negligence or willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity; nor shall the provisions hereof limit the liability of a landowner

them "organized" or "sponsored" the race, as those terms are used in the release.

who receives consideration for giving another permission to enter upon land to engage in any activity described in paragraph[ ] (b) . . . hereof. Va. Code § 29-130.2 (now codified at Section 29.1-509, 1989 Acts, cc. 26, 500, 505).

As noted above, the Plaintiff does not allege any conduct amounting to "gross negligence" or "malicious failure to guard or warn against a dangerous condition," so the first clause of (d) is inapplicable here. To bring itself within the ambit of this statute, therefore, each remaining defendant must demonstrate (1) that it is a landowner, and (2) that it did not receive consideration for giving the Plaintiff permission to use the land. Furthermore, to support an award of summary judgment, the defendants have the burden of establishing all of these factors on the strength of the pleadings and admissions. Each of these will be addressed in turn.

Subsection (a) defines "landowner" as "the legal title holder, lessee, occupant, or any other person in control of land or premises." It is unclear how Defendant Penland could be considered a "landowner." At best, he could arguably be considered a "person in control" of the Lake for purposes of the race. The Court need not resolve Penland's status under the statute at this time, though, since Penland has expressly denied having had responsibility for organizing and running the race. *See* Penland's Answer at para. 3, denying para. 12 of the Second Amended Motion for Judgment. If he denies having organized the race, there is no basis for finding that he controlled the property. Having failed to bring himself within either the release or the statute, Penland's motion for summary judgment is accordingly denied.

Turning next to BBI and BARLAMA, the allegations and admissions set forth in the Second Amended Motion for Judgment and Answers thereto support a conclusion that both defendants are within the statute. The Plaintiff alleged and BBI admitted that BBI owned Lake Barcroft (para. 6 of Second Amended Motion for Judgment and para. 6 of BBI's Answer). Further, Plaintiff alleged and BARLAMA admitted that BARLAMA "operated, supervised, and controlled" the Lake (para. 6 Second Amended Motion for Judgment and para. 6 of BARLAMA's Answer). The Court holds that BBI

is the legal title holder and BARLAMA is a "person in control of" Lake Barcroft: both are landowners within the scope of § 29-130.2(a).

The next question is whether BBI or BARLAMA received any consideration for giving Plaintiff permission to use the land. Nowhere does the Plaintiff allege in his Second Amended Motion for Judgment that BBI or BARLAMA received any consideration in connection with the triathlon. The closest the Plaintiff comes is to generally allege:

(1) that BBI and BARLAMA "owned, operated, supervised, controlled and maintained" Lake Barcroft on the date of the accident (para. 6);

(2) that LABARCA sponsored the race "with the concurrence and permission" of BBI and BARLAMA (para. 7);

(3) that Novins invited Plaintiff to participate in the race (para. 10); and

(4) that Plaintiff was lawfully on the Defendant's property as an "invited guest" of Defendant Novins (para. 13).

More importantly, the Entry Form which Plaintiff admittedly signed clearly states that the $11.00 entry fee was payable to LABARCA.

In his opposition to summary judgment, Plaintiff offers neither facts nor argument to support a conclusion that BBI or BARLAMA received any consideration.[4] Instead, he advances an interpretation of the statute whereby landowners who "restrict access to their property and only allow in invited guests or receive consideration for the use of their land" are not to be given the benefit of the statute's limited liability. BBI and BARLAMA respond that the statute simply contains no language to support such an interpretation.

The only reported case construing this statute was decided fifteen years ago by the District Court for the Eastern District of Virginia. There, the Court held that paying taxes to the federal government did not constitute consideration for entry upon land within the meaning of

---

[4] The parties do disagree over whether the fee was paid for permission to use the land or to cover the costs of running the event, but this dispute is immaterial as to these defendants since the Plaintiff has failed to allege that BBI or BARLAMA received any consideration in the first place.

this statute. *Hamilton v. United States*, 371 F. Supp. 230, 235 (E.D. Va. 1974).[5] This case clearly does not present any useful guidance as to these facts. The Court must therefore resort to a straightforward statutory interpretation.

The provision in question was codified in Title 29 of the Code, Game, Inland Fisheries and Dogs. More specifically, § 29-130.2 was set forth in Article 1 of Chapter 8 of this Title, General Game and Fish Laws - In General. Most of the provisions in Article 1 discuss the powers and duties of Virginia's Commission of Game and Inland Fisheries. This Commission is generally charged with adopting and enforcing regulations governing hunting and fishing. The final section in Article 1 is § 29-130.2, entitled "Duty of care and liability for damages of landowners to hunters, fishermen, sightseers, etc." Viewed in this context, § 29-130.2 is thus seen as part of the legislature's efforts to regulate the recreational use of private property. Despite this, Plaintiff argues that the intention of § 29-130.2 was:

> to encourage landowners to make their property available to gratuitous users for recreational purposes by limiting their liability. However, landowners who restrict access to their property and only allow in invited guests or receive consideration for the use of their land are not given the benefit of the statute's limited liability.

Under this view, the statute is not to be applied to these landowners because they have (1) restricted access to their property, and (2) received consideration. Instead,

---

[5] The District Court also established a two-fold test for determining the application of this statute: (1) the person must have come upon the land to hunt, trap, swim, etc., and (2) no consideration must have been paid "by the user" to the landowner. Hamilton, 371 F. Supp. at 234. The Defendants contend that this language conclusively establishes the applicability of the statute here since Plaintiff admits he did not pay any fee. In light of the admission that the Plaintiff paid no consideration to BBI or BARLAMA, there is no need to express any opinion here concerning the validity of the District Court's formula.

the duty of care is to be determined under common law tort and property law principles, based on the status of the Plaintiff as an invitee, licensee, etc.

This interpretation ignores the plain fact that the legislature has already addressed the circumstances in which the lower standard of care is or is not to be applied: those circumstances are set forth in subsection (d). Landowners are not shielded from liability for gross negligence, and they voluntarily waive legislative protection if they receive consideration for giving another permission to enter upon their land.

The Court has previously noted that the Plaintiff has failed to allege that BBI or BARLAMA received any consideration in connection with this race. Beyond this, there does not appear to be any legislative or case law authority to support an interpretation that subsection (d) is intended to strip the legislative protection from landowners who "restrict access to their property." By definition, all landowners are entitled to restrict access to their property. This is the basis of the law of trespass and represents a fundamental tenet of private property ownership. If these common law restrictions were sufficient to avoid the application of the recreational use statute, the statute would never apply to any landowner. An interpretation which completely eviscerates an entire law must be rejected.

The Plaintiff might respond that his argument is intended to refer to restrictions imposed by landowners beyond those provided by the common law. In this case, for instance, only Lake Barcroft residents and their guests were permitted to participate in the triathlon. But this interpretation would open the door to a case-by-case determination of which type of restrictions are sufficient to avoid application of the statute. This would inject tremendous uncertainty into this area of the law, thus defeating the very purpose of the recreational use statute. Indeed, the legislature avoided this very possibility by specifying what a landowner must do in order to strip himself of the statute's protection: he must "receive consideration for giving another person permission to enter upon the land . . . ." The Plaintiff has alleged the kind of simple negligence claims which are squarely within the contemplation of the statute, BBI and BARLAMA

have clearly placed themselves within the statute, and the Plaintiff has failed to show why they should be dislodged.

In conclusion, summary judgment is granted as to LABARCA under the release, granted as to BBI and BARLAMA under the recreational use statute, and denied as to Penland. In light of the foregoing conclusions, it is unnecessary to reach Defendants' remaining arguments concerning Plaintiff's assumption of risk, causation, or resolve Plaintiff's status as between a licensee or an invitee under property law principles.