Merrimack
No. 85-204

JOHN E. BARNES *& a.*

v.

NEW HAMPSHIRE KARTING ASSOCIATION, INC. *& a.*

May 12, 1986

*David J. KillKelley*, of Laconia, by brief and orally, for the plaintiffs.

*Sulloway Hollis & Soden*, of Concord (*Edward M. Kaplan* and *Robert J. Lanney* on the brief, and *Mr. Kaplan* orally), for the defendants.

KING, C.J.   The plaintiffs, John E. and Virginia A. Barnes, sued the New Hampshire Karting Association (NHKA), David E. Whitesell, Midway Raceway, Inc. d/b/a Bryar Motorsport Park (Bryar), the World Karting Association (WKA) and International Insurance Company (International) for damages arising from injuries sustained by John Barnes (Barnes, or the plaintiff) in an Enduro kart collision at Bryar in 1981. Defendants Whitesell, NHKA, WKA and Bryar moved for summary judgment, claiming that the release executed by Barnes barred him from seeking recovery. Following a hearing, the Master (*Louie C. Elliott, Jr.*, Esq.) recommended that the defendants' motion for summary judgment be granted as to all counts asserted by John Barnes against Whitesell, NHKA, WKA and Bryar. The master recommended denial of the motion for summary judgment as to the claims asserted by Virginia Barnes and ruled that the release did not bar claims against International. The Superior Court (*DiClerico*, J.) approved the master's recommendations. We affirm.

On August 29, 1981, before entering the pit area at the Bryar Motorsport Park, John Barnes signed a "pit pass" containing the release at issue. The pass comprised three parts; the participant was given the top portion, which stated "THE HOLDER ACKNOWLEDGES SIGNING WAIVER & RELEASE FROM LIABILITY BEFORE ENTERING TRACK AREA." The middle section, which each participant was required to sign in order to receive a number for the race, provided:

### "RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT

IN CONSIDERATION of being permitted to enter for any purpose any RESTRICTED AREA (herein defined as including but not limited to, the racing surface, pit areas, infield, burn out area, approach area, shut down area, and all walkways, concessions and other areas appurtenant to

any area where any activity related to the event shall take place), or being permitted to compete, officiate, observe, work for, or for any purpose participate in any way in the event, EACH OF THE UNDERSIGNED . . .

1. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE . . . from all liability to the undersigned . . . for any and all loss or damage, and any claim or demands therefor on account of injury to the person or property or resulting in death of the undersigned, whether caused by the negligence of the releases [sic] or otherwise while the undersigned is in or upon the restricted area, and/or competing, officiating in, observing, working for, or for any purpose participating in the event;

. . .

3. HEREBY ASSUMES FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE due to the negligence of releasees or otherwise while in or upon the restricted area and/or while competing, officiating, observing, or working for or for any purpose participating in the event.

EACH OF THE UNDERSIGNED expressly acknowledges and agrees that the activities of the event are very dangerous and involve the risk of serious injury and/or death and/or property damage. . . .

THE UNDERSIGNED HAS READ AND VOLUNTARILY SIGNS THE RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT, and further agrees that no oral representations, statements of inducements [sic] apart from the foregoing written agreement have been made."

The master found that Barnes did not read the release portion before signing the pit pass on this occasion or on the previous occasions he had raced at the track. Nonetheless, Barnes admitted that he had read the top portion and understood that the document he was signing was "[s]ome sort of waiver or release."

Barnes proceeded to take a practice run. As he rounded a blind turn, his kart collided with a disabled kart on the track. No flagman was present to warn drivers of hazards out of view beyond that turn. John Barnes and his wife, Virginia, sued the defendants for injuries and loss of consortium, respectively, alleging liability for ordinary and gross negligence.

The question presented for review is whether the plaintiff's causes of action are barred by the release and waiver of liability and indemnity agreement he signed. Barnes contends that the release does not bar his claims because it violates public policy, is ambiguous, and does not apply to risks not inherent in the sport, which were not within the contemplation of the parties. He further argues that the release does not cover gross negligence, and that it is void because it involves an illegal tying arrangement.

■■■ Exculpatory agreements call into conflict two tenets of the law. First, a party should be liable for the consequences of the negligent breach of a duty owed another. As this court stated in a recent case involving an amusement ride accident, the owner of a place of public amusement "must exercise that degree of care which, under the same or similar circumstances, would be exercised by an ordinarily careful or prudent individual." *Siciliano v. Capitol City Shows, Inc.*, 124 N.H. 719, 730, 475 A.2d 19, 25 (1984). Failure to do so will result in liability for injuries proximately caused by the breach of duty.

■■■ Contraposed against this basic rule of tort law is the principle that, as a matter of efficiency and freedom of choice, parties should be able to contract freely about their affairs. ABA Special Committee on the Tort Liability System, *Towards a Jurisprudence of Injury: The Continuing Creation of a System of Substantive Justice in American Tort Law* § 5-27 (Nov. 1984); *Morrow v. Auto Championship Racing Ass'n, Inc.*, 8 Ill. App. 3d 682, 685, 291 N.E.2d 30, 32 (1972). Under this rule, parties may bargain for various levels of risk and benefit as they see fit. Thus, a plaintiff may agree in advance that the defendant has no legal duty toward him and thereby assume the risk of injury arising from the defendant's conduct. *See* W. KEETON, D. DOBBS, R. KEETON, D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 68, at 480–81 (5th ed. 1984) (hereinafter cited as PROSSER & KEETON).

■■■ In New Hampshire, exculpatory contracts are generally prohibited. A defendant seeking to avoid liability must show that the exculpatory agreement does not contravene public policy; *i.e.*, that no special relationship existed between the parties and that there was no other disparity in bargaining power. Where the defendant is a common carrier, innkeeper or public utility, or is otherwise charged with a duty of public service, the defendant cannot by contract rid itself of its obligation of reasonable care. RESTATEMENT (SECOND) OF TORTS § 496B, comment g (1965); RESTATEMENT OF CONTRACTS § 575 (1932); *see Wessman v. Railroad*, 84 N.H. 475, 152 A. 476 (1930).

Courts have refused to uphold such agreements because one party is at an obvious disadvantage in bargaining power. PROSSER & KEETON, *supra* § 68, at 482.

> "The disparity in bargaining power may arise from the defendant's monopoly of a particular field of service, from the generality of use of contract clauses insisting upon assumption of risk by all those engaged in such a field, so that the plaintiff has no alternative possibility of obtaining the service without the clause; or it may arise from the exigencies of the needs of the plaintiff himself, which leave him no reasonable alternative to the acceptance of the offered terms."

RESTATEMENT (SECOND) OF TORTS § 496B, comment j (1965). *Cf. Cailler v. Humble Oil & Refining Co.*, 117 N.H. 915, 919, 379 A.2d 1253, 1256 (1977). Where there is a disparity in bargaining power, the plaintiff may not be deemed to have freely chosen to enter into the contract; accordingly, courts refuse to enforce the agreement. *See Shaer Shoe Corporation v. Granite State Alarm, Inc.*, 110 N.H. 132, 135, 262 A.2d 285, 287 (1970).

■■ Once an exculpatory agreement is found unobjectionable as a matter of public policy, it will be upheld only if it appears that the plaintiff understood the import of the agreement or that a reasonable person in his position would have known of the exculpatory provision. Furthermore, the plaintiff's claims must have been within the contemplation of the parties at the time of the execution of the agreement. *Arnold v. Shawano County Agr. Society*, 106 Wis. 2d 464, 470, 317 N.W.2d 161, 164 (1982), *aff'd*, 111 Wis. 2d 203, 330 N.W.2d 773 (1983). The parties need not, however, have contemplated the precise occurrence that resulted in the plaintiff's injuries. They may adopt language to cover a broad range of accidents, as they did in this case by specifying injuries involving negligence on the part of the defendants.

■■ Nonetheless, since the terms of the contract are strictly construed against the defendant, the contract must clearly state that the defendant is not responsible for the consequences of his negligence. PROSSER & KEETON, *supra* § 68, at 483–84. As long as the language of the release clearly and specifically indicates the intent to release the defendant from liability for personal injury caused by the defendant's negligence, the agreement will be upheld. *Cf. Commercial Union Assurance Co. v. Brown Co.*, 120 N.H. 620, 623, 419 A.2d 1111, 1113 (1980).

■■■ As a preliminary matter, we note that the plaintiff's failure to read the entire release does not preclude enforcement of the agreement. Barnes testified that he was in a line of people waiting to pay money and obtain numbers for the race and that the workers wanted to "get [them] on [their] way." There was no evidence, however, that Barnes was denied the opportunity to read the body of the release. "[H]aving failed to avail himself of that opportunity, yet gaining the admission to which his signature was a condition precedent, he cannot now complain that he had no notice of the import of the paper . . . he signed." *Lee v. Allied Sports Associates, Inc.*, 349 Mass. 544, 550, 209 N.E.2d 329, 332 (1965).

■■■ With these principles in mind, we now consider whether the release bars the plaintiff's claims in this case. The first question is whether the release is contrary to public policy. The defendants do not fall within any of the commonly-recognized classes of persons charged with a duty of public service. The record indicates that the 1981 Enduro kart races at Bryar were organized by the NHKA, which is associated with the WKA and which manages its races in accordance with WKA rules and regulations. Although the defendants serve a segment of the public, we cannot say that Enduro kart racing is affected with a public interest. Provision of racing facilities is not a service of great importance to the public, nor is racing a matter of practical necessity. *Winterstein v. Wilcom*, 16 Md. App. 130, 138, 293 A.2d 821, 825 (1972).

■■■ Moreover, there was no substantial disparity in bargaining power among the parties, despite the fact that Barnes was required to sign the release in order to use the racetrack. The plaintiff was under no physical or economic compulsion to sign the release. Since the defendants' service is not an essential one, the defendants had no advantage of bargaining strength over Barnes or others who sought to participate in Enduro kart racing. *Cailler*, 117 N.H. at 919, 379 A.2d at 1256; *Schlessman v. Henson*, 83 Ill. 2d 82, 86–87, 413 N.E.2d 1252, 1254 (1980). Barnes wished to compete and voluntarily agreed not to hold others liable for his injuries. Hence, we conclude that the release was not barred by public policy and may be upheld.

■■■ The plaintiff cites a number of cases from other jurisdictions that hold on public policy grounds that an exculpatory agreement does not release defendants from liability for gross negligence. These cases are inapposite because New Hampshire law does not distinguish causes of action based on ordinary and gross negligence. "[T]he doctrine of definitive degrees of negligence is not recognized as a part of our common law. . . ." *Lee v. Chamberlin*, 84 N.H. 182,

188, 148 A. 466, 469 (1929). The plaintiff advances no reasons for abandoning this rule and we decline to create an exception to allow him to pursue his claims of gross negligence.

We now examine the language of the release to determine the extent of its coverage. Barnes contends that the accident did not occur in a "restricted area" because, although he was on the racing surface, the area did not become *restricted* until numbers were given and racing had begun, and he was merely taking a practice lap at the time of the accident. In interpreting this contract, we will give language used by the parties its common meaning, *Murphy v. Doll-Mar, Inc.*, 120 N.H. 610, 611–12, 419 A.2d 1106, 1108 (1980), and will give the contract itself the meaning that would be attached to it by a reasonable person. *Kilroe v. Troast*, 117 N.H. 598, 601, 376 A.2d 131, 133 (1977).

The first paragraph of the release states that the release is given "IN CONSIDERATION of being permitted to enter for any purpose any RESTRICTED AREA . . . or being permitted to compete . . . or for any purpose participate in any way in the event . . . ." The agreement defines "restricted area" as including "the racing surface, pit areas, infield, burn out area, approach area, shut down area, and all walkways, concessions and other areas appurtenant to any area where any activity related to the event shall take place." Finally, the agreement states that the defendants are released "from all liability to the undersigned . . . whether caused by the negligence of the releases [sic] or otherwise while the undersigned is in or upon the restricted area, and/or competing . . . or for any purpose participating in the event."

We find that participation in practice laps on the racing surface comes within the terms of the release. The restricted areas are defined in terms of physical spaces, not in terms of function, and the reference to "enter[ing] for any purpose" contemplates that the racing surface is a restricted area during practice runs and during the actual race. Although the plaintiff testified that he had practiced on occasion without signing a release, he signed the release prior to taking a practice lap on the day in question. One can contemplate that racers are exposed to a variety of hazards while in the racing arena regardless of whether the actual race is taking place. We believe that the practice run taken by Barnes in preparation for the race later that day may reasonably be construed as part of "participat[ion] in the event." We therefore uphold the master's conclusion that the language of the agreement was not ambiguous and that the release applied to practice laps.

█ Barnes contends that the release is unenforceable because it involves an illegal tying arrangement. He asserts that, in violation of RSA 417:4, XIII, the pit pass and certain insurance coverage were offered at a single price, without an option to take one "product" and not the other. RSA 417:4, XIII provides that it is an unfair method of competition and an unfair and deceptive act and practice in the business of insurance to:

> "Arrang[e] or participat[e] in any plan to offer or effect in this state as an inducement to the purchase or rental by the public of any property or services, any insurance for which there is no separate charge to the insured. . . ."

Although it appears that no separate charge was made for the insurance, we find that the insurance was not offered as an inducement to the purchase of the pit pass or the use of the Bryar Motorsport Park.

*Affirmed.*

All concurred.