Hillsborough-northern judicial district
No. 2008-499

MARCELLA MCGRATH

v.

SNH DEVELOPMENT, INC. & a.

Argued: February 12, 2009
Opinion Issued: April 8, 2009

*Fernald, Taft, Falby & Little, P.A.*, of Peterborough (*Richard L. Pennington* on the brief and orally), for the plaintiff.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Thomas Quarles, Jr.* and *Leigh S. Willey* on the brief, and *Mr. Quarles* orally), for the defendants.

BRODERICK, C.J. The plaintiff, Marcella McGrath, appeals an order of the Superior Court (*Abramson*, J.) granting summary judgment to the defendants, SNH Development, Inc. and John Doe, an unnamed individual. We affirm.

I

The undisputed facts are as follows. On February 20, 2004, the plaintiff was snowboarding at the Crotched Mountain Ski Area when she was involved in a collision with a snowmobile operated by John Doe, an employee of the ski area. Crotched Mountain Ski Area is owned and operated by SNH Development, Inc., a subsidiary of Peak Resorts, Inc.

Prior to this incident, the plaintiff, a season pass holder, was required to sign two separate documents in order to obtain her pass (the agreements). The first, an application for the pass, states:

> I understand and accept the fact that alpine skiing in its various forms is a hazardous sport, and I realize that injuries are a common occurrence. I agree, as a condition of being allowed to use the ski area facility, that I freely accept and voluntarily assume all risks of personal injury or death or property damage, and release Crotched Mountain its owners and its agents, employees, direc-

tors, officers and shareholders from any and all liability for personal injury or property damage which results in any way from negligence, conditions on or about the premises, the operations of the ski area including, but not limited to, grooming, snow making, ski lift operations, actions or omissions of employees or agents of the area, or my participation in skiing, accepting myself the full responsibility.

The second document, a "Liability Release Agreement," contains language identical to the application in all material respects, again providing, "I agree, as a condition of being allowed to use the area facility, that I . . . release Peak Resorts, Inc., . . . from any and all liability for personal injury . . . which results in any way from negligence . . . ."

The plaintiff subsequently filed a negligence action against the defendants. The defendants moved for summary judgment, arguing that the agreements, signed by the plaintiff, are valid and enforceable exculpatory contracts. The trial court granted the motion. After her motion for reconsideration was denied, the plaintiff filed this appeal.

When we review a trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *Orr v. Goodwin*, 157 N.H. 511, 513 (2008). "We will affirm if the evidence reveals no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law." *Dean v. MacDonald*, 147 N.H. 263, 266 (2001) (quotation omitted). We review the trial court's application of the law to the facts *de novo*. *Id.*

Although New Hampshire law generally prohibits exculpatory contracts, we will enforce them if: (1) they do not violate public policy; (2) the plaintiff understood the import of the agreement or a reasonable person in his position would have understood the import of the agreement; and (3) the plaintiff's claims were within the contemplation of the parties when they executed the contract.

*Id.* at 266-67.

On appeal, the plaintiff asserts that the application and liability release agreement are unenforceable because: (1) they violate public policy; (2) the parties did not contemplate the negligent operation of a snowmobile when the contracts were executed; and (3) as a matter of law, a release should be limited in application to the ordinary risks inherent to the sport or sports in question. We address each argument in turn.

## II

■ The plaintiff first asserts that the ski pass application and liability release agreement are unenforceable because they violate public policy. "A defendant seeking to avoid liability must show that an exculpatory agreement does not contravene public policy; *i.e.*, that no special relationship existed between the parties and that there was no other disparity in bargaining power." *Barnes v. N.H. Karting Assoc.*, 128 N.H. 102, 106 (1986). We have found an agreement to be against public policy if, among other things, it is injurious to the interests of the public, violates some public statute, or tends to interfere with the public welfare or safety. *Harper v. Healthsource New Hampshire*, 140 N.H. 770, 775 (1996).

The plaintiff argues that, "[p]ublic policy is clearly offended by the notion that [the] Defendants would be relieved from public safety laws enacted pertaining to snowmobiles," namely, RSA chapter 215-C (Supp. 2008), by virtue of an exculpatory contract. The plaintiff notes that, under RSA chapter 215-C, it is unlawful to operate a snowmobile so as to endanger any person, RSA 215-C:8, IV, and, further, a snowmobile "shall yield the right of way to any person on . . . skis," RSA 215-C:49, XII. The plaintiff alleges these provisions were violated, and it would be against public policy to "relieve" the defendants of these statutory requirements. The defendants, however, argue that RSA chapter 215-C does not apply to the operation of snowmobiles on private property, and, thus, the statute has no bearing on the enforcement of the agreements.

■ Assuming, without deciding, that RSA chapter 215-C applies to the operation of snowmobiles on privately owned land, we disagree that the agreements relieve the defendants of any responsibility under the statute. The plaintiff's waiver of negligence claims in the agreements has no effect upon the enforcement of the statute. *See* RSA 215-C:32 (enforcement), :34 (penalties for violation). Indeed, it is the State that is charged with enforcing this statute, and it is free to pursue the alleged violations, notwithstanding the plaintiff's waiver. The fact that an exculpatory agreement waives the right to bring a negligence action arising out of an activity that is regulated by statute is not determinative of a public policy violation. As is the case here, the interests of the public are protected by the State's ability to enforce the statute. Irrespective of the statute, the plaintiff has voluntarily agreed not to hold the ski area, or its employees, liable for injuries resulting from negligence so that she may obtain a season ski pass. Therefore, we conclude the agreements do not contravene public policy as injurious to the interests of the public, violative of a public statute or interfering with the public welfare.

■ The plaintiff also argues that the agreements violate public policy because she had a special relationship with the defendants. The plaintiff contends that both the statutory duty to yield under RSA 215-C:49, XII and the ski area's status as an area of public accommodation created this special relationship. We disagree. In *Barnes*, we stated that a special relationship exists "[w]here the defendant is a common carrier, innkeeper or public utility, or is otherwise charged with a duty of public service." *Barnes*, 128 N.H. at 106. With respect to RSA chapter 215-C, the plaintiff does not point to, nor are we aware of, any support for her proposition that this statute creates a special relationship between the parties by virtue of its application. While the statute does impose certain restrictions on the operation of a snowmobile, we disagree that the statutory duty to yield is equivalent to being charged with a duty of public service.

■ Likewise, the fact that the ski area is available for public use is not dispositive of a special relationship. *See id.* at 108. In *Barnes,* we examined the exculpatory contract between an Enduro kart racing facility and a driver injured while racing on the track. *Id.* at 104-05. In determining that the applicable release did not violate public policy, we held, "Although the defendants serve a segment of the public, we cannot say that Enduro kart racing is affected with a public interest. Provision of racing facilities is not a service of great importance to the public, nor is racing a matter of practical necessity." *Id.* at 108. We likewise cannot say that the recreational activity of snowboarding is of such great importance or necessity to the public that it creates a special relationship between the ski area and the plaintiff.

■ Moreover, we disagree that there was a disparity in bargaining power because she was required to sign the agreements before obtaining her season pass. Where there is a disparity in bargaining power, the plaintiff may not be deemed to have freely chosen to enter into the contract. *Id.* at 107.

> The disparity in bargaining power may arise from the defendant's monopoly of a particular field of service, from the generality of use of contract clauses insisting upon assumption of risk by all those engaged in such a field, so that the plaintiff has no alternative possibility of obtaining the service without the clause; or it may arise from the exigencies of the needs of the plaintiff himself, which leave him no reasonable alternative to the acceptance of the offered terms.

*Id.* (quotations omitted). Here, we do not find any substantial disparity in bargaining power. *See id.* at 108. Although the plaintiff was required to sign

the application and liability release agreement before obtaining her pass, she was under no physical or economic compulsion to do so. *Id.* Further, the defendants' service is not an essential service, so there was no advantage in bargaining strength in that regard. *Id.* We therefore conclude there is no disparity in bargaining power, and the agreements do not violate public policy.

## III

The plaintiff next asserts that the agreements are not enforceable because the parties did not contemplate a liability release from negligence involving the operation of a snowmobile. In order to uphold an exculpatory contract, the plaintiff's claims must have been within the contemplation of the parties at the time of the execution of the agreement. *Id.* at 107. However, the parties need not have contemplated the precise occurrence that resulted in the plaintiff's injuries, and may adopt language that covers a broad range of accidents. *Id.*

To determine the scope of the application and liability release agreement, we examine its language. *Dean*, 147 N.H. at 267. "In interpreting a release, we give the language used by the parties its common meaning and give the contract itself the meaning that would be attached to it by a reasonable person." *Id.* (quotation and brackets omitted). "As long as the language of the release clearly and specifically indicates the intent to release the defendant from liability for personal injury caused by the defendant's negligence, the agreement will be upheld." *Id.* (quotation omitted). We strictly construe exculpatory contracts against the defendant. *Id.*

The plaintiff asserts that a reasonable person would not understand the agreements to apply to negligent operation of a snowmobile because neither makes reference to a snowmobile or states that it would relieve the defendants from the duty to safely operate snowmobiles. We disagree. The ski pass application signed by the plaintiff clearly states: "I freely accept and voluntarily assume all risks of personal injury . . . and release Crotched Mountain . . . from *any and all* liability for personal injury or property damage which results *in any way from negligence* . . . ." (Emphases added.) The liability release agreement mirrors this language, releasing the defendants from "any and all liability for personal injury, death or property damage which results in any way from negligence." While the application and liability release agreement do not specifically make reference to injuries arising from the negligent operation of a snowmobile, the language of these agreements clearly and specifically indicates the intent to release the defendants from liability for personal injury caused by the defendants' negligence, which is all that is required. *Id.* Further, we conclude that the

546

plaintiff's claim falls within the terms of the two agreements. The plaintiff sustained injuries while using the ski area because of the alleged negligent act of the defendant's employee. *See id.* at 268.

Although making no specific argument in this regard, the plaintiff appears to use the formatting of the agreements to support her claim that a reasonable person would not have contemplated the agreements applied to a collision with a snowmobile. However, upon our review of the agreements, we conclude that neither the font nor the formatting obscured the exculpatory clause contained in the agreements such that a reasonable person would not be aware of its application. *Cf. Wright v. Loon Mt. Recreation Corp.*, 140 N.H. 166, 170 (1995) (finding structure and organization of the contract did obscure exculpatory clauses).

██ The plaintiff further challenges "whether the Defendants themselves contemplated [that] the release" would apply to negligence involving a snowmobile. However, "[w]e judge the intent of the parties by objective criteria rather than the unmanifested states of mind of the parties." *Dean*, 147 N.H. at 267 (quotation omitted). Indeed, the defendants are not required to "have contemplated the precise occurrence that caused the plaintiff's injuries" provided the language of the agreements "cover[s] a broad range of accidents" involving negligence on their part. *Id.* Therefore, whether the defendants contemplated this precise occurrence is not dispositive.

## IV

The plaintiff argues that the agreements should only be enforceable against the ordinary risks inherent to the sports of skiing and snowboarding. We disagree. While we have previously limited certain exculpatory contracts to the inherent risks of the activity at issue, we did so based upon the language of that specific release. *See Wright*, 140 N.H. at 170; *Audley v. Melton*, 138 N.H. 416, 418-19 (1994). In *Wright*, the exculpatory contract detailed the risks involved with horseback riding, including those related to the selection of the injured party's horse and the "use of this animal." *Wright*, 140 N.H. at 171. The clause concluded with: "I *therefore* release the defendant from ANY AND ALL LIABILITY FOR PERSONAL INJURY TO MYSELF RESULTING FROM THE NEGLIGENCE OF THE DEFENDANT TO INCLUDE NEGLIGENCE IN SELECTION, ADJUSTMENT OR ANY MAINTENANCE OF ANY HORSE." *Id.* at 170 (quotation, brackets and ellipses omitted). We concluded that the meaning of this clause was "less than clear," because "[t]he paragraphs preceding the exculpatory clause emphasize the inherent risks of horseback riding. Because the exculpatory clause is prefaced by the term 'therefore,' a reasonable person might understand its language to relate to

the inherent dangers of horseback riding and liability for injuries that occur for that reason." *Id.* (quotation omitted). We found this language was "further clouded by the qualifying language that follows," and ultimately concluded that the contract "lack[ed] a straightforward statement of the defendant's intent to avoid liability for its failure to use reasonable care in any way." *Id.* at 170, 171-72.

In *Audley*, the exculpatory contract recognized certain inherent risks associated with working with wild animals, and then promised to hold the defendant "free of any or all liability." *Audley*, 138 N.H. at 417 (quotation omitted). We concluded that this language did not effectively release the defendant from liability based upon his own negligence because the contract failed to clearly state the defendant was not responsible for the consequences of his own negligence. *Id.* at 419. We further stated, "The release fails in this respect not because it neglects to use the word 'negligence' or any other special terms; instead, it fails because no *particular* attention is called to the notion of releasing the defendant from liability for his own negligence." *Id.*

Here, there is no such ambiguity. Unlike the exculpatory clauses in both *Wright* and *Audley*, the agreements here clearly release the defendants from *any* liability relating to the negligence of its employees or the operation of the ski area. There is no qualifying language or other provision obscuring the defendants' intent. Nor is there any ambiguity in the language used. We therefore conclude that a reasonable person would have contemplated that the agreements released the defendants from any negligence, not just from negligence inherent to the sports of skiing and snowboarding.

*Affirmed.*

DALIANIS, DUGGAN and HICKS, JJ., concurred.