# United States Court of Appeals
## For the First Circuit

No. 18-1409

THOMAS JACKSON MILLER,

Plaintiff, Appellant,

v.

THE SUNAPEE DIFFERENCE, LLC, d/b/a Mount Sunapee Resort,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph Laplante, U.S. District Judge]

Before

Barron and Selya, Circuit Judges,
and Katzmann, Judge.[*]

Daniel Charles Perrone, with whom Cullenberg & Tensen PLLC
was on brief, for appellant.
Thomas Quarles, Jr., with whom Jonathan M. Shirley and Devine,
Millimet & Branch, P.A. were on brief, for appellee.

March 11, 2019

---

[*] Of the United States Court of International Trade, sitting
by designation.

**BARRON**, **Circuit Judge**.  Thomas Jackson Miller collided with unmarked snowmaking equipment while skiing at the Mount Sunapee Resort in 2015 in Sunapee, New Hampshire.  Soon thereafter, he brought a tort suit under New Hampshire law against the resort's owner, The Sunapee Difference, LLC ("Mount Sunapee"), in the District of New Hampshire.  Mount Sunapee moved for a judgment on the pleadings under Federal Rule of Civil Procedure 12(c), and the District Court granted the motion after treating it, under Federal Rule of Civil Procedure 12(d), as a motion for summary judgment.  Miller now appeals that judgment, which we affirm.

## I.

Miller visited the Mount Sunapee Resort in 2015 following a large snowfall.  Before taking to the slopes, he purchased a lift ticket.  The dispute on appeal concerns the import of what was printed on that ticket.

The front of the lift ticket displayed the following text in 4.3-point font:

> **LIABILITY RELEASE**
> Skiing, snowboarding, and other winter sports are inherently dangerous and risky with many hazards that can cause injury or death. As purchaser or user of this ticket, I agree, as a condition of being allowed to use the facilities of the Mount Sunapee resort, to freely accept and voluntarily assume all risks of property damage, personal injury, or death resulting from their inherent or any other risks or dangers. **I RELEASE MOUNT SUNAPEE RESORT**, its parent companies, subsidiaries, affiliates, officers, directors, employees

and agents **FROM ANY AND ALL LIABILITY OF ANY KIND INCLUDING NEGLIGENCE** which may result from conditions on or about the premises, operation of the ski area or its facilities [sic] or from my participation in skiing or other winter sports, accepting for myself the full and absolute responsibility for all damages or injury of any kind which may result from any cause. Further I agree that any claim which I bring against Mount Sunapee Resort, its officers, directors, employees or agents shall be brought only in Federal or State courts in the State of New Hampshire. I agree my likeness may be used for promotional purposes.

MOUNT SUNAPEE CARES, SKI RESPONSIBLY AND ALWAYS IN CONTROL.

**RECKLESS SKIING WILL RESULT IN LOSS OF TICKET**

NON-TRANSFERRABLE: Use by a non-purchaser constitutes theft of services.

NON-REFUNDABLE. LOST TICKETS WILL NOT BE REPLACED.

(emphasis in original).

The front of the lift ticket also contained some additional text. At the bottom of the front of the ticket, the words "Mount Sunapee" were displayed in large font but upside down. A large white space appeared in between the upside down words "Mount Sunapee" and the release language set forth above, in which details about the individual ticket, such as the date and the ticket type, could be printed when each lift ticket is sold.

The lift ticket itself is essentially a large sticker with a peel-off backing. The peel-off backing of the ticket, like

the peel-off backing of a sticker, is a piece of paper that keeps the ticket from adhering to anything until it is ready to be used.

Once the peel-off backing is removed, the adhesive is exposed. The skier thus may fold the ticket in half so that the adhesive side of the ticket sticks to itself around a metal tag that affixes to a zipper or other visible part of the skier's clothing.

To attach the ticket to the skier's clothing in this manner, however, the skier must first peel the backing off of the lift ticket. On the face of that peel-off backing, the following text appears in red font that is larger than the text on the front of the ticket itself:

STOP [a red octagon image similar to a

traffic-control "stop sign"]

YOU ARE RELEASING THIS SKI AREA FROM LIABILITY

By removing this peel-off backing and using this ticket, you agree to be legally bound by the LIABILITY RELEASE printed on the other side of this ticket. If you are not willing to be bound by this LIABILITY RELEASE, please return this ticket with the peel-off backing intact to the ticket counter for a full refund.

While skiing at the Mount Sunapee resort after purchasing such a lift ticket and affixing it to his clothing in the manner just described, Miller struck an unmarked "snow gun holder" that was concealed by snow. The "holder" is a mounting

post for snowmaking guns and is "essentially a steel pipe protruding from the ground." No snowmaking gun was in the holder at the time of the accident.

Miller suffered serious leg injuries in the collision. In 2016, he brought a single negligence claim against Mount Sunapee under New Hampshire law in the District of New Hampshire, invoking diversity jurisdiction under 28 U.S.C. § 1332(a), to recover for the injuries that resulted from his collision with the unmarked and unpadded piece of snowmaking equipment. Miller's complaint alleged that Mount Sunapee was liable for his injuries because, among other things, it "failed to mark or warn skiers of the pipe, or otherwise mitigate its danger to skiers, by, for example, padding it or making it visible to skiers."

Mount Sunapee moved for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). Mount Sunapee argued in its motion that the liability release printed on Miller's lift ticket barred Miller's claim. Shortly thereafter, Miller amended his complaint to include four new factual allegations. In opposing Mount Sunapee's Rule 12(c) motion, Miller argued, among other things, that these new factual allegations sufficed to plead that Mount Sunapee had been not only negligent but also reckless with respect to the presence of the covered snowmaker with which Miller collided and that, for this reason, too, the release was

not a bar to at least his claim that Mount Sunapee had been reckless.

Both parties submitted documents beyond the pleadings to support their arguments. Accordingly, the District Court converted the motion into one for summary judgment under Federal Rule of Civil Procedure 12(d). The District Court then ruled for Mount Sunapee on the basis of the release. Miller now appeals.

**II.**

"Although New Hampshire law generally prohibits a plaintiff from releasing a defendant from liability for negligent conduct, in limited circumstances a plaintiff can expressly consent by contract to assume the risk of injury caused by a defendant's negligence." Allen v. Dover Co-Recreational Softball League, 807 A.2d 1274, 1281 (N.H. 2002). For such a contract to be enforceable, the party seeking to enforce it must show that (1) it does "not violate public policy;" (2) "the plaintiff understood the import of the agreement or a reasonable person in his position would have understood the import of the agreement;" and (3) "the plaintiff's claims were within the contemplation of the parties when they executed the contract." Dean v. MacDonald, 786 A.2d 834, 838 (N.H. 2001).

The District Court properly characterized the defendant's motion to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 12(c) as one under Federal Rule of Civil

Procedure Rule 12(d), because "matters outside the pleadings [were] presented to . . . the court." Fed. R. Civ. P. 12(d). Under that rule, a district court must treat the motion as "one for summary judgment under [Federal] Rule [of Civil Procedure] 56." Id.

We review the denial of such a motion de novo. McConkie v. Nichols, 446 F.3d 258, 260 (1st Cir. 2006). In undertaking that review, we must "constru[e] the record in the light most favorable to the non-moving party and resolv[e] all reasonable inferences in that party's favor." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014). If the record reveals "no genuine dispute as to any material fact," the moving party -- here, Mount Sunapee -- "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A.

Miller contends that the District Court erred in granting summary judgment based on the release because the question of whether there was a "meeting of the minds" with respect to the release was one of fact that had to be left to the jury to resolve. But, we do not agree.

The District Court correctly rejected Miller's contention that the mere fact that he did not sign the release precluded the grant of summary judgment against him. As the District Court noted, the New Hampshire Supreme Court has held

that an unsigned insurance contract can be enforceable even though it has not been signed. Gannett v. Merchants Mut. Ins. Co., 552 A.2d 99, 102 (N.H. 1988) (citing Barnes v. New Hampshire Karting Ass'n, 509 A.2d 151, 154 (N.H. 1986)). Moreover, lower courts in New Hampshire have found that liability releases on lift tickets -- even though unsigned -- may be binding. Camire v. Gunstock Area Comm'n, No. 11-C-337, 2013 LEXIS 30, at *8 (N.H. Super. Ct. Mar. 22, 2013) aff'd on other grounds, 97 A.3d 250 (N.H. 2014); Reynolds v. Cranmore Mountain Resort, No. 00-C-0035, at *7-8 (N.H. Super. Ct. Mar. 20, 2001).

Similarly, the District Court correctly rejected Miller's contention that the fact that the record supportably showed that he did not read the release precluded the grant of summary judgment. As the District Court explained, New Hampshire law does not require that the plaintiff "actually read the release, when the release clearly and unambiguously stated the condition, and when [the plaintiff] had the opportunity" to do so. Gannett, 552 A.2d at 102 (emphasis added).

To be sure, Miller did contend below -- as he now argues on appeal -- that the record supportably shows that he did not have the opportunity to read the release. But, while the record supportably shows that he did not, as the District Court succinctly put it, "take advantage" of the opportunity to read the release that he did have, it indisputably shows that he did have such an

opportunity.  Thus, the fact that Miller may not have read the release provides no basis, in and of itself, for concluding that the District Court erred in granting summary judgment against him.

That leaves, then, only Miller's contention -- to the extent that he raised it below, which is not altogether clear -- that the District Court erred in granting summary judgment because the release was not "sufficiently conspicuous to communicate its existence."  In so arguing, Miller relies on a New Hampshire Superior Court case, Reynolds, No. 00-C-0035, which he contends shows that, in circumstances like those presented here, the question of whether there was a meeting of the minds is one of fact that was for the jury to resolve.

But, Reynolds held that the release in that case was not conspicuous -- and thus that the question of whether it was binding was one of fact for the jury -- only because the court determined that the presentation on the lift ticket of the text that set forth the release was not "sufficiently conspicuous" to require the conclusion "that a reasonable person in [the plaintiff's] position would have known of the exculpatory provision."  Id. at *7 (quoting Barnes, 509 A.2d at 107).  Here, however, the District Court noted that Miller testified in his deposition that the lift ticket containing the release in his case was handed to him face up and that Miller's counsel conceded at argument that Miller would have "recognize[d] [the release] as a release."  As Miller does not

dispute that characterization of his testimony or his counsel's concessions at argument, we see no basis for rejecting the District Court's conclusion that

> "[b]ased on the summary judgment record, the plaintiff's concessions at oral argument and his supplemental deposition testimony <u>sua sponte</u> ordered by the court in an abundance of caution, . . . the undisputed facts demonstrate that [Miller] purchased the lift ticket, peeled it from its backing before attaching it to his clothing, had the opportunity to read both sides of it, and that 'a reasonable person in plaintiff's position' would have 'known of the exculpatory provision.'"[1]

## B.

Having dispensed with the meeting of the minds issue, we now move on to consider Miller's next ground for challenging the District Court's ruling, in which he contends that the release's scope is so limited that it is no bar to his suit. The portion of the release that is in question reads: "[a]s purchaser or user of this ticket, I agree, as a condition of being allowed to use the

---

[1] Miller invokes our recent decision in <u>Cullinane</u> v. <u>Uber Techs., Inc.</u>, 893 F.3d 53 (1st Cir. 2018), which was decided after the District Court had made its ruling on Mount Sunapee's motion for judgment on the pleadings. But, nothing about that case -- which interpreted Massachusetts rather than New Hampshire law and did not deal with a similar release -- bears on the correctness of the District Court's ruling. <u>See</u> <u>id.</u> at 61. We note, too, that Miller made no argument below that, even if the text of the lift ticket was sufficiently conspicuous to make the exculpatory language known, the release was still not enforceable because it failed to alert a reasonable person that peeling off the peel-off backing of the ticket would suffice to manifest assent to the terms of the release.

facilities of the Mount Sunapee Resort, to freely accept and voluntarily assume all risks of property damage, personal injury, or death resulting from their inherent or any other risks or dangers."

Miller argues that the general interpretive rule that the specific governs the general requires that this text be read to release Mount Sunapee only as to the risks inherent in skiing. Miller further argues that the inherent risks of skiing do not include running into unmarked snowmaking equipment on the slopes.

Miller relies for this argument on Wright v. Loon Mountain Recreation Corp., 663 A.2d 1340 (N.H. 1995), in which the release included several "paragraphs preceding the exculpatory clause" that "emphasize[d] the inherent hazards of horseback riding." Id. at 1343; see id. at 1341. The exculpatory clause then read:

> I therefore release Loon Mountain Recreation Corporation, its owners, agents and employees FROM ANY AND ALL LIABILITY FOR DAMAGES AND PERSONAL INJURY TO MYSELF OR ANY PERSON OR PROPERTY RESULTING FROM THE NEGLIGENCE OF LOON MOUNTAIN RECREATION CORPORATION TO INCLUDE NEGLIGENCE IN SELECTION, ADJUSTMENT OR ANY MAINTENANCE OF ANY HORSE, accepting myself the full responsibility for any and all damages or injury of any kind which may result. (PLEASE SIGN: Brenda Wright/s)

Id.

But, in finding that release to be limited to the inherent risks of horseback riding, the New Hampshire Supreme Court in

_Wright_ first noted that "[t]he paragraphs preceding the exculpatory clause emphasize[d] the inherent hazards of horseback riding" and that "[b]ecause the exculpatory clause is prefaced by the term 'therefore,' a reasonable person" might read the release language to relate back to those inherent hazards. _Id._ at 1343. The New Hampshire Supreme Court found that the exculpatory clause in that case was "further clouded by the qualifying language that follows," which stated that the release "include[d] negligence in selection, adjustment or maintenance of any horse." _Id._ (quoting release).

The release at issue here contains neither of these two features.  In fact, Miller's reading of the release -- as Mount Sunapee points out -- necessarily renders the phrase "or any other risks or dangers" to be meaningless.  See _Commercial Union Assurance Co._ v. _Brown Co._, 419 A.2d 1111, 1113 (N.H. 1980) (disfavoring constructions that render contractual terms superfluous).  Moreover, as Mount Sunapee also rightly emphasizes, a sentence in the release that Miller ignores but that immediately follows the one on which Miller rests his scope argument expressly states:

> **I RELEASE MOUNT SUNAPEE RESORT**, its parent companies, subsidiaries, affiliates, officers, directors, employees and agents **FROM ANY AND ALL LIABILITY OF ANY KIND INCLUDING NEGLIGENCE** which may result from conditions on or about the premises, operation of the ski area or its facilities [sic] or from my

> participation in skiing or other winter sports, accepting for myself the full and absolute responsibility for all damages or injury of any kind which may result from any cause.

(emphasis in original). Yet, as Mount Sunapee contends, this language "very clearly encompasses and bars Plaintiff's claims of negligence and renders his limiting interpretation wholly inconsistent with the plain language and import of the Liability Release."

We thus do not find Miller's attempt to equate his case with Wright persuasive. And, accordingly, we decline to construe the scope of the release to be as limited as Miller suggests it is.

## c.

We turn, then, to Miller's contention that the release is unenforceable because it is against public policy. Under New Hampshire law, "[a] defendant seeking to avoid liability must show than an exculpatory agreement does not contravene public policy; i.e., that no special relationship existed between the parties and that there was no other disparity in bargaining power." McGrath v. SNH Dev., Inc., 969 A.2d 392, 396 (N.H. 2009)(quoting Barnes, 509 A.2d at 106). Moreover, as the New Hampshire Court explained in McGrath, an exculpatory agreement has been found to be against public policy "if, among other things, it is injurious to the

- 13 -

interests of the public, violates some public statute, or tends to interfere with the public welfare or safety."  Id.

But, McGrath explains that "[t]he fact that an exculpatory agreement waives the right to bring a negligence action arising out of an activity that is regulated by statute is not determinative of a public policy violation."  Id.  And while Miller attempts to argue that this liability release is against public policy -- and thus unenforceable -- because it would free Mount Sunapee from what he contends is a statutorily imposed duty on operators of ski areas to warn skiers of snowmaking equipment on the slopes,[2] we are not persuaded.

Miller does point to N.H. Rev. Stat. Ann. § 225-A:23, but that statute's plain terms make clear that it does not, on its own, impose any such duty.  The statute refers only to a different set of duties on ski area operators, including marking trail difficulty levels and warning skiers "by use of a trail board" located at the base of the mountain of "snow grooming or snow making operations [that] are routinely in progress."  N.H. Rev. Stat. Ann. § 225-A:23.  Nor is there any merit to Miller's strained

---

[2] Miller also challenges the enforceability of the liability release on the ground that it violates public policy because ski area operators have a common law duty to protect skiers from the non-inherent risks of skiing.  But Miller did not raise this argument below, nor does he explain how he can show plain error.  See Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487, 503 (1st Cir. 2011).

- 14 -

contention that the expressly enunciated statutory duties set forth in N.H. Rev. Stat. Ann. § 225-A:23 must be understood to include one that is not mentioned at all -- namely, a duty of reasonable care with respect to any risk that is not identified in a different statute, N.H. Rev. Stat. Ann. § 225-A:24. In fact, that statute does not purport to set forth any duties of ski area operators, as it instead by its terms sets forth only the risks that skiers assume. N.H. Rev. Stat. § 225-A:24.

Miller separately contends that the liability release is unenforceable on public policy grounds because Mount Sunapee operates the Mount Sunapee resort on New Hampshire state land and, "unlike the operator of a private ski area, is charged with a duty of public service, pursuant to which it must allow public access to the Mount Sunapee Ski resort." Miller then notes that, per the commentary to the Restatement (Second) of Torts § 496B, liability releases that "relate[] to the . . . performance of any part of [a public] duty . . . will not be given effect." Restatement (Second) of Torts § 496B, cmt. g.

But, under New Hampshire law, "the fact that [a] ski area is available for public use is not dispositive of a special relationship" that might give rise to the sort of public duty contemplated by § 496B. McGrath, 969 A.2d at 397; see Barnes, 509 A.2d at 154 (explaining that the public duties contemplated by the commentary to § 496B of the Restatement arise out of the existence

- 15 -

of a special relationship).  And Miller identifies no authority to suggest that the rule is otherwise applicable simply because a privately-run ski area that is open to the public is also on publicly owned land.  We thus agree with the District Court that Miller supplies no basis for concluding that the special relationship he must identify under McGrath exists.

### D.

We turn, finally, to Miller's contention that the release does not bar his claim under New Hampshire law that Mount Sunapee's conduct vis-à-vis the snowmaker with which he collided was not merely negligent but reckless.[3]  To support this contention, Miller points to Perry v. SNH Development, No. 2015-CV-00678, 2017 N.H. Super. LEXIS 32 (N.H. Sup. Ct. Sept. 13, 2017), a New Hampshire Superior Court case that held that liability releases do not bar claims of recklessness under New Hampshire law.  But, even assuming that Perry correctly states New Hampshire law, we find, like the District Court, that Miller has failed to provide a basis upon which a jury could supportably find Mount Sunapee to have been reckless.

---

[3] Even though Miller's claim is nominally one for "negligence" he may still, under New Hampshire law, have adequately pled a claim for recklessness if the factual allegations support such a claim. See Migdal v. Stamp, 564 A.2d 826, 828-29 (N.H. 1989) (finding factual allegations to be "sufficient to establish a claim of reckless or wanton conduct, even though the plaintiffs use[d] the term 'negligence' in their complaint").

Conduct rises to the level of "recklessness" under New Hampshire law "if it 'would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.'" Boulter v. Eli & Bessie Cohen Found., 97 A.3d 1127, 1132 (N.H. 2014) (quoting Restatement (Second) of Torts § 500 (1965)). Thus, conduct is "reckless" where "the known danger ceases to be only a foreseeable risk which a reasonable person would avoid, and becomes in the mind of the actor a substantial certainty." Thompson v. Forest, 614 A.2d 1064, 1068 (N.H. 1992) (quoting W.P. Keeton et al., Prosser & Keeton on the Law of Torts § 8, at 36 (5th ed. 1984)).

Miller argues that Mount Sunapee's conduct meets this high bar because "Mount Sunapee knew, or should have known, in light of receiving thirty-five inches of snow in the weeks leading up to the accident, that unmarked snowmaking equipment, such as that with which he collided, had become covered, and concealed from view, by snow." To support the contention that Mount Sunapee had "actual notice that unmarked snowmaking equipment was covered with snow," he points to a grooming report prepared two weeks before his accident. Miller then characterizes the grooming report as "directing that snow be removed from the snowmaking equipment it knew was covered." Miller thus contends that this report

- 17 -

"demonstrates that Mount Sunapee knew of the 'danger to life or safety of others' presented by unmarked, concealed snowmaking equipment."

But, as Mount Sunapee points out, the grooming report refers to an entirely different trail, on a different part of the mountain, nearly two weeks before Miller's accident. In addition, the affidavit from Alan Ritchie, the Mountain Operations Manager at Mount Sunapee and the report's author, states that he does not, in the grooming report, instruct groomers to uncover the referenced hydrants because "[t]hey are not in the skiable terrain." Nor does Miller point to anything else in the record that could permit a jury to find that Mount Sunapee was aware that there were covered snow gun holders on skiable terrain, let alone that Mount Sunapee was aware that the snowmaking equipment with which Miller collided was covered in snow.

Thus, the District Court was correct to conclude that Miller failed to identify evidence in the record that could suffice to support the conclusion that the "known danger" posed by the snowmaking equipment was a "substantial certainty" rather than merely a "foreseeable risk." Thompson, 614 A.2d at 1068. Nor are the cases that Miller cites to support his argument for overturning the District Court's ruling to the contrary. Each found that the

defendant was reckless because they were, in fact, aware of the risk that they subsequently disregarded.[4]

### III.

For the foregoing reasons, the judgment below is **affirmed**.

---

[4] See Migdal, 564 A.2d at 828 (finding defendants to be reckless where they were "aware of the fact that their minor son had ransacked and vandalized their home, was suffering from mental and emotional instabilities and exhibited dangerous propensities, [and] nevertheless failed to seek recommended medical treatment for him and allowed him access to an array of firearms and ammunition"); Perry, 2017 N.H. Super. LEXIS 32, at *33-34 (holding that a jury could reasonably find ski lift operators to be reckless where operators did not stop the chair lift after observing a child who was improperly loaded dangling from the lift).